```
 1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF ARKANSAS
 2                        WESTERN DIVISION

 3   UNITED STATES OF AMERICA,

 4                   Plaintiff,

 5    v.                              No. 4:16CR170 SWW

 6   ROY LEE BOLES, JR.              February 8, 2017
                                     Little Rock, Arkansas
 7                   Defendant.      9:59 a.m.

 8

 9               TRANSCRIPT OF SUPPRESSION HEARING
             BEFORE THE HONORABLE SUSAN WEBBER WRIGHT,
10                 UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   On Behalf of the Government:

14       MR. HUNTER BRIDGES, Assistant U.S. Attorney
            United States Attorney's Office
15          425 West Capitol Avenue, Suite 500
            Post Office Box 1229
16          Little Rock, Arkansas  72203-1229

17   On Behalf of Defendant:

18       MS. NICOLE LYBRAND, Assistant Federal Defender
            Federal Public Defender's Office
19          1401 West Capitol Avenue, Suite 490
            Little Rock, Arkansas  72201
20

21

22

23       Proceedings reported by machine stenography and displayed

24   in realtime; transcript prepared utilizing computer-aided

25   transcription.
```

Cheryl Nelson Kellar, RPR, CRR, CCR
United States Court Reporter

1                           **I N D E X**

2

3   **WITNESSES FOR GOVERNMENT:**   **Direct**   **Cross**   **Redirect**   **Recross**

4   Daniel Haley                  5          15         21

5   Jeffrey Elenbaas             22          27

6

7                    *  *  *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cheryl Nelson Kellar, RPR, CRR, CCR
United States Court Reporter

```
 1                    P R O C E E D I N G S
 2           THE COURT:  Good morning.  This is a hearing in United
 3  States v Roy Lee Boles, Jr.  Mr. Boles is here with his
 4  attorney, Ms. Nicole Lybrand.  The United States is represented
 5  by Mr. Hunter Bridges.
 6       Who is at your table, Mr. Bridges?
 7           MR. BRIDGES:  This is Detective Michael Gibbons, a TFO
 8  with ATF.
 9           THE COURT:  Good morning.  I want to make sure
10  Mr. Boles is competent to proceed.
11       So, Mr. Boles, if you would stand up.  You don't have to
12  go anywhere.
13       Mr. Green is -- I am sorry.  You don't have to stand up,
14  but I wanted to recognize you.  I am sorry.
15           MR. GREEN:  Good morning, Your Honor.
16           THE COURT:  Good morning.
17       I want to make sure you are competent, Mr. Boles, and I am
18  going to swear you to ask you about your competency, okay?
19           THE DEFENDANT:  Yes.
20            ROY LEE BOLES, JR., DEFENDANT, DULY SWORN
21           THE COURT:  Mr. Boles, are you under the influence of
22  any drugs or medicine or anything that might interfere with
23  your ability to understand this proceeding?
24           THE DEFENDANT:  No, ma'am.
25           THE COURT:  And, Ms. Lybrand, do you believe he is
```

1    competent to proceed?

2            MS. LYBRAND:  I do, Your Honor.

3            THE COURT:  He looks competent to me, so we will

4    proceed.  You-all may be seated.

5        This is a hearing on a motion to suppress.  Does anyone

6    want to invoke the witness sequestration rule?

7            MS. LYBRAND:  I would, Your Honor.

8            THE COURT:  It is invoked.  Anyone in the courtroom

9    who is a witness or the representative of a witness, you are to

10   be excluded except one representative, who is the agent at the

11   table.

12           MR. BRIDGES:  Yes.

13           THE COURT:  Okay.  So now, are you going to call a

14   witness -- are you going to call one of these witnesses right

15   off the bat?

16           MR. BRIDGES:  I am going to call Officer Haley, yes,

17   ma'am.

18           THE COURT:  I don't think we need any argument at the

19   front end.  Is that okay?

20           MS. LYBRAND:  Yes, Your Honor.

21           MR. BRIDGES:  Okay.

22           THE COURT:  I will let you argue at the end.  Just

23   call your first witness.

24           MR. BRIDGES:  Yes, ma'am.  We will call Officer Daniel

25   Haley.

1          **DANIEL HALEY, GOVERNMENT'S WITNESS, DULY SWORN**

2                        DIRECT EXAMINATION

3   BY MR. BRIDGES:

4   Q    Can you please state your name for the record.

5   A    Daniel Haley.

6   Q    And you are an officer with North Little Rock Police

7   Department?

8   A    Yes, I am.

9   Q    What is your current position?

10  A    I am a sergeant in the patrol division.

11  Q    How long have you been sergeant in patrol division?

12  A    Four years in April.

13  Q    And what are your responsibilities in that position?

14  A    It depends on who is assigned to me at the time as far as,

15  you know, you have got a set group of people that work either

16  on your shift or that you, you know, take care of scheduling

17  and paperwork and complaints and just things like that.  And

18  you work with them hand-in-hand backing them on calls or taking

19  calls and just basically where it leads you every day.

20  Q    And do you occasionally engage in patrol yourself?

21  A    Yes.  Absolutely.

22  Q    And was that your position back in March of 2016 as well?

23  A    Yes.

24  Q    Do you recall a traffic stop you made on March 19th, 2016,

25  around 3:45 in the afternoon?

1    A    Yes, I do.

2    Q    Was that a stop of a tan Buick Regal?

3    A    Yes.

4    Q    Were you assigned to a particular area that day?

5    A    We are citywide.  We just happened to be downtown at that

6    particular moment.

7    Q    And where were you precisely when you first saw that tan

8    Buick?

9    A    I was northbound on Pike Avenue.

10   Q    And relative to you, where were they?

11   A    It was -- it had crossed from the west side of Pike

12   Avenue, kind of pulled southbound and then into the turn lane

13   and then turned left, which would be going east onto 19th

14   Street.

15   Q    So was it in front of you?

16   A    Yeah.  Basically in front of -- if I am going towards it,

17   I am going northbound.  He basically crossed my path.  He came

18   south towards me, and he turned left in front of me.

19   Q    So it's in front of you and traveling left to right as you

20   see it?

21   A    No.  It would be right to left.  He is southbound, so he

22   is southbound making a left-hand turn.

23   Q    Okay.  Is that right?

24   A    Yeah.

25   Q    How fast were you traveling?

1  A    Oh, probably 25, 30 miles an hour.  There is a red light

2  right there at 18th Street.  So you can't go too fast through

3  there unless you really want to get hit.

4  Q    And was the Buick moving at normal speed of traffic?

5  A    Normal speed.  Nothing insane.

6  Q    And as the car, the Buick, crossed your path, did you have

7  a clear view in the car?

8  A    Yes.

9  Q    Were you able to see the occupants inside the car?

10  A    Yes.

11  Q    And when you saw this tan Buick, did you know at that

12  point that there was any sort of contraband inside of it?

13  A    No, I did not.

14  Q    Were you for some reason looking to pull that car over to

15  search for contraband?

16  A    No, sir.

17  Q    When you saw that tan Buick, did you immediately recognize

18  the occupants of that vehicle?

19  A    No, sir.

20  Q    Had you had any experience with Mr. Boles prior to that

21  day?

22  A    I have prior in the past.  It's been a while, but I am not

23  sure exactly the grounds of it.

24  Q    So did you eventually initiate a traffic stop on this tan

25  Buick?

1    A    Yes, I did.

2    Q    Why did you do that?

3    A    The driver's view had several cracks in the windshield

4    that was obstructing the driver's view.

5    Q    And you were able to see these as the vehicle crossed your

6    path?

7    A    Yes.

8    Q    And can you explain where the cracks in the windshield

9    were?

10   A    If you are sitting in the driver's seat, it had like a

11   long crack and splintered off into -- if you are sitting in the

12   steering wheel, you are going to be looking through two cracks

13   in the windshield.

14   Q    Do you often pull people over for cracked windshields?

15   A    Yes.  It depends.  If they're obstructing the view like

16   that, yes.

17   Q    And in light of your knowledge and training, is it a

18   violation of Arkansas law to drive a vehicle with a windshield

19   that's cracked that obscures the driver's view?

20   A    Yes, sir, it is.

21   Q    Do you occasionally see cars with windshields that are

22   cracked that you don't pull over?

23   A    Yes.

24   Q    Why wouldn't you pull them over?

25   A    If it's not obstructing the driver's view or if, again,

1    you are on a hot call or something, you don't have time to make

2    those stops or --

3    Q    Have you ever ticketed someone for having a cracked

4    windshield?

5    A    Yes, sir, I have.

6    Q    Can you ballpark how long the crack in this windshield

7    was?

8    A    Probably -- well, the initial crack was probably a foot

9    or so, and then it splintered off.  So probably 18 inches to 2

10   feet, something like.

11   Q    Horizontal or vertical?

12   A    It wasn't straight, but it's like a catty-cornered and

13   then they split off.

14   Q    So after you saw the crack in the windshield, you

15   initiated a traffic stop?

16   A    Yes, sir.

17   Q    And did you activate your blue lights?

18   A    Yes, sir, I did.

19   Q    And when you turned on the blue lights, did you have to

20   make a turn to follow the vehicle?

21   A    The vehicle had gone in front of me, and I made the turn

22   behind it.

23   Q    And did that tan Buick pull over to the curb?

24   A    It did.

25   Q    How long was it between the time you put on your blue

1  lights and the vehicle turned over to the curb?

2  A    I turned at just west of Schaer and went -- it's a row of

3  apartments, probably the second building Silver City

4  Apartments, so maybe less than a block.

5  Q    Was that three seconds, five seconds, less?

6  A    Probably three or less.  It wasn't very long.

7  Q    And was it your understanding that the vehicle was coming

8  to park at its destination?

9  A    It was -- he pulled into a parking spot, which it's a

10 parallel parking spot right there.  There is no vehicle in

11 front, so just pulled up right there to the curb.

12 Q    And was your patrol car equipped with a camera?

13 A    No, sir.

14 Q    Why not?

15 A    None of the supervisor's cars are.  I don't know if that's

16 a money thing, but we don't have them.  We don't make a whole

17 lot of stops like that.

18 Q    Did you take any pictures of the windshield?

19 A    No.

20 Q    Why not?

21 A    I never have taken them of that.

22 Q    Do you normally take pictures of cars that you stop?

23 A    No, sir.

24 Q    In the past if you have given someone a ticket for a

25 cracked windshield, did you take pictures of those windshields?

1    A    No, sir.

2    Q    Even if you are giving a ticket?

3    A    No, sir.

4    Q    So what happened when you pulled the car over?

5    A    I exited my patrol vehicle.  About the same time I was

6    doing that, the passenger of the tan Buick was getting out of

7    the car.  No one was looking at me in the mirrors, which is

8    pretty -- I mean, normally they see you.  And in my experience,

9    they did not know I was there, at which point -- I didn't know

10   at the time it was Mr. Boles -- he was starting to -- like he

11   was going to walk off from the vehicle.  And I had ordered him

12   back to the car.  The surprise on their faces was -- he turned

13   around like, what?  When I said, "Hey, get back in the car," he

14   turned around and was like:  Who is this?  Total shock of me

15   being there.  So they did not know I was there.

16   Q    And you ordered him back into the car.  Did you do that

17   more than once?

18   A    It was almost three times.  I had to get more stern each

19   time to get him back to the vehicle.

20   Q    And at some point during the stop did another officer

21   assist you?

22   A    Yes.  Officer Elenbaas had arrived.

23   Q    Approximately how long after the stop?

24   A    Probably within 30 seconds, 45 seconds.  It wasn't very

25   long at all.

1    Q     Okay.  And did you call for backup?

2    A     No, I did not.

3    Q     And then did you approach the driver or passenger?

4    A     Initially, I approached the driver's side of the vehicle,

5    and after I dealt with the driver -- Officer Elenbaas was

6    dealing with the passenger.  After I dealt with Mr. Perry, the

7    driver, I went around to where Mr. Boles was.

8    Q     And can you walk the Court through what happened after you

9    approached the driver?

10   A     Prior to the actual -- him exiting the vehicle, he reaches

11   up underneath the seat.  It looked like he had placed something

12   underneath the passenger seat of the vehicle.  He exits the

13   car, and I am on high alert on what's happening there.  That's

14   when I say, "Hey, get back in the car."

15             THE COURT:  Who is "he"?

16             THE WITNESS:  Mr. Boles, the passenger.

17             THE COURT:  I think the question went to the driver.

18   I'm sorry.  Start over.

19   BY MR. BRIDGES:

20   Q     So you initially see Mr. Boles exit the vehicle.  Explain

21   what you said to Mr. Boles.

22   A     Mr. Boles had exited the vehicle and was walking away from

23   the vehicle.  He didn't know I was there at the time, and then

24   I ordered him back to the vehicle three times total to get him

25   back to the car.  About that time Officer Elenbaas is arriving

1  to handle that side of the car, and I go and make contact with

2  the driver.

3  Q    So to clarify, did Mr. Boles get back into the vehicle

4  after you ordered him --

5  A    Yes, he did.

6  Q    And you approached the driver's side of the vehicle?

7  A    Yes.

8  Q    And you approached the driver?

9  A    Yes.

10  Q    What happened then?

11  A    You could smell marijuana coming from the vehicle.  At one

12  point I had Mr. Perry exit, began to do a pat-down of him.  You

13  could see marijuana shake scattered around the --

14  Q    Could you explain what marijuana shake is?

15  A    It is the leaves and stems scattered on the seat, and it

16  was on Mr. Boles's lap, clothing as well.  I had Mr. Perry exit

17  the car, started the pat-down, located some marijuana on him,

18  and I placed him in custody.

19  Q    Did you ticket the driver for having a broken windshield?

20  A    I did not.

21  Q    Why not?

22  A    He had just purchased the vehicle.  It had paper tags on

23  it, and he had a job at the time and explained that to me.  He

24  just purchased the car, didn't have an extensive history or

25  anything like that.  So I didn't feel it was necessary to do

1  that.

2  Q    Is it fair to say once you arrested both occupants of the

3  vehicle for other charges, the broken windshield was secondary?

4         THE COURT:  Tell me.  I missed something about the

5  gun.  I interrupted a response and never heard anything more

6  about a gun.

7         MR. BRIDGES:  Yes, Your Honor.

8  BY MR. BRIDGES:

9  Q    After both occupants of the car were in custody, did you

10  then return to search the car?

11  A    Yes.  Mr. Boles wasn't in custody yet.  He was just being

12  detained basically at the back of the car.  I began to search

13  the vehicle and underneath his seat.

14         THE COURT:  When did you see him -- you testified that

15  you saw "him," and I was thinking driver and not passenger.

16  And I think you were talking about the defendant here, who was

17  the passenger.  And so I want to find out when you saw him --

18  you said something about you saw him reach under the seat.

19         THE WITNESS:  Yes, ma'am.

20         THE COURT:  Was that the driver?

21         THE WITNESS:  Passenger.

22         THE COURT:  At what point?  Before he first got out of

23  the car?

24         THE WITNESS:  Yes.  Prior to getting out, he leaned up

25  one of his hands up under the seat of the vehicle and just from

1    past experiences, it's a pretty normal spot for someone to do

2    that.  And after he did that, he was -- he exited the vehicle

3    after that.  And that's about -- of course, I am putting my car

4    in gear, seeing it, getting out, and we kind of exited almost

5    at the same time.  And so I am getting out of my car as he is

6    getting out of the passenger side of the vehicle.

7              THE COURT:  Thank you.

8              THE WITNESS:  Sorry about that.

9    BY MR. BRIDGES:

10   Q    And did someone eventually come to pick up the vehicle to

11   drive home?

12   A    Yes.  Mr. Perry's mother, I believe.  I am pretty sure it

13   was his mom.  Yes.  Susan Bryan, which was his mother.

14   Q    And if you thought that the vehicle had cracks in the

15   windshield that made it unsafe for driving, why did you let Mom

16   drive it home?

17   A    It was five or six blocks away.  I told her, "Hey, we're

18   not going to tow the car.  It's a pretty good expense.  Your

19   son is working.  If you will drive it home and get the

20   windshield fixed, we will call it even on that."  So she picked

21   up the car and, as far as I know, took it home from there.

22             MR. BRIDGES:  I will pass the witness.

23             THE COURT:  All right.  Ms. Lybrand?

24                     CROSS-EXAMINATION

25   BY MS. LYBRAND:

1    Q    How long have you been in law enforcement in general?

2    A    20 years this year.

3    Q    And all of that in North Little Rock?

4    A    No, ma'am.  I worked for Pulaski County before coming to

5    North Little Rock.

6    Q    So you went to police academy in Camden?

7    A    No.  In Little Rock.  I have had a round-robin.

8    Q    Okay.  When you encountered the vehicle that Mr. Boles was

9    a passenger in, you were sitting at a traffic light; is that

10   accurate?

11   A    No, ma'am.  I was actually traveling northbound.

12   Q    And was the vehicle coming towards you or driving beside

13   you?

14   A    No.  The vehicle was coming towards -- I am coming this

15   way and he is this way and they turn in front of me.

16   Q    And they make a left turn in front of you?

17   A    Yes, ma'am.

18   Q    Into the Silver City --

19   A    On to 19th.

20   Q    And how far is 19th from the final destination where they

21   parked the vehicle?

22   A    From 19th and Cross, Schaer, and -- go off to the right.

23   The next street is Marion, so between Marion and Schaer.

24   Q    So a couple of blocks?

25   A    Maybe a block and a half at the most.

1    Q    And they turn left in front of you, and do you immediately

2    turn right to follow them?

3    A    Well, the vehicle turned.  Of course, there was a gap.  So

4    they were able to turn in front of me without a problem, and I

5    turned right behind them.  So they were maybe half a block or a

6    third of a block in front of me, yes.

7    Q    And were they stopped, waiting to make a left turn?  I am

8    trying to figure out how much time you had to observe the

9    vehicle.

10   A    I don't recall if they paused.  If so, it wasn't for very

11   long.  If it was, it was pretty quick.

12   Q    And what statute would you submit allows you to stop a car

13   for a cracked windshield?

14   A    There is a windshield obstruction statute.  I don't have

15   my code book in front of me, but it's like 27-something.

16   Q    So it's the windshield obstruction statute, is what you --

17   A    It's that, and there is one in reference to an obstructed

18   driver's view.  I don't know what the actual statute is.  I

19   believe it's called "obstructed driver's view."  You will have

20   to look on that to see which one it is.

21   Q    So one of those two statutes dealing with obstructing a

22   view?

23   A    Yes, ma'am.

24   Q    And in your training and experience in law enforcement, do

25   you often take pictures of different crime scenes to document

1    them or different acts which you believe will result in

2    charges?

3    A    Depending on -- domestics and things like that, yeah.

4    Q    Is it common to take pictures of things you believe will

5    result in felony charges?

6    A    No, ma'am.

7    Q    No?  Just write a report and that's it?

8    A    It depends on what you are doing.  If you are moving -- I

9    can say things have changed over the years where if we, like,

10   locate a gun in the bushes somewhere that you say someone

11   threw, we photograph it prior to removing it or something like

12   that.

13   Q    In this case did you document the gun before you pulled it

14   out of the car?

15   A    No, ma'am.

16   Q    Did you document it after you pulled it out of the car?

17   A    No, ma'am.

18   Q    And you remember just from memory how large this cracked

19   windshield was?

20   A    Yes, ma'am.  Vaguely.

21   Q    How many traffic stops or how many interactions do you

22   have with people daily?

23   A    Daily, not nearly as many now.  Probably a couple a day.

24   Q    Okay.  How many reports, if you had to ballpark, do you

25   think you wrote last year?

1   A    Probably a hundred or so.

2   Q    Okay.  And we have covered this, but there was no citation

3   for a moving offense in this case, correct?

4   A    Yes, ma'am.

5   Q    There was not a citation?

6   A    There was not a citation, right.

7   Q    And in your report you state -- you talked about seeing

8   marijuana when you came in contact with the driver, I believe;

9   is that correct?

10  A    Yes, ma'am.

11  Q    And you stated you saw some marijuana shake and that you

12  smelled marijuana or burnt marijuana I guess?

13  A    Yes.

14  Q    In your report you state that there was marijuana attached

15  to Mr. Boles's pants, but I didn't hear any testimony about

16  that.  Can you elaborate?

17  A    Whenever people are rolling their blunts or they split

18  open a cigarillo and put marijuana in it, they spill something.

19  Q    So there was shake on his pants?

20  A    There was some on his lap and some on his seat.

21  Q    And both of the vehicle occupants disclaimed ownership of

22  the gun, correct?  Neither one said they owned it?

23  A    Correct.

24  Q    And you did not cite Mr. Boles for anything related to

25  marijuana, correct?

1   A    Correct.

2   Q    You cited the driver for that?

3   A    Yes.  He actually was in possession of a small amount he

4   had in his pocket.

5   Q    And you charged Mr. Boles with possession of the handgun

6   that was found?

7   A    Yes, ma'am.

8   Q    When you activate your blue lights, is there any type of

9   record kept of that since you don't have a camera in your car?

10  A    No, ma'am.

11  Q    Okay.  In this circumstance, you didn't activate your

12  siren, correct?

13  A    Correct.

14  Q    Why was that?

15  A    There was no reason to.

16  Q    Okay.  So there is a procedure on when you activate a

17  siren?

18  A    Yes.  When someone is fleeing or we are trying to notify

19  the public that we're -- you are trying to give them extra time

20  so they can hear a siren coming so they can stay aware.

21  Q    So in this case, because the driver was stopping the

22  vehicle already, you didn't activate your siren?

23  A    Correct.

24  Q    And you believe that they did not see you blue-lighting

25  them?

1  A    Absolutely.  I am 100-percent sure they didn't know I was

2  there at that moment.

3  Q    So this was their final destination where they were

4  headed?

5  A    They were going somewhere -- yeah.  He later indicated he

6  was going to see someone at Silver City.  I don't remember his

7  exact words, but they had arrived where they were going.

8  Q    Okay.

9          MS. LYBRAND:  Your Honor, may I confer briefly?

10         THE COURT:  You may.

11         MS. LYBRAND:  Pass the witness.

12         THE COURT:  Do you have any redirect, Mr. Bridges?

13         MR. BRIDGES:  Yes, Your Honor.

14         THE COURT:  All right.

15                    REDIRECT EXAMINATION

16  BY MR. BRIDGES:

17  Q    Just a couple of questions.  Are you issued a camera?  Are

18  you allowed to take pictures?

19  A    I am not, no, sir.  I typically use my phone if I do

20  anything like that.

21  Q    And to clarify, is the reason that you would pull a car

22  over for a broken windshield because you believe that car would

23  be in an unsafe condition?

24         MS. LYBRAND:  Your Honor, objection to leading.

25         THE COURT:  Yes.  I will sustain the objection.

1  BY MR. BRIDGES:

2  Q    For what reason would you pull over a car with a broken

3  windshield?  Cracked?

4  A    Safety reasons, i.e. to try to let someone have a chance

5  to fix it.  A lot of people -- they typically don't know that,

6  hey, we can't have a car like that.  It's almost like a

7  courtesy sometimes, let them know to get that fixed, it's

8  something you can be stopped for and cited for.

9           MR. BRIDGES:  No further questions.

10          MS. LYBRAND:  Nothing further, Your Honor.

11          THE COURT:  All right.  May Officer Haley be excused?

12          MR. BRIDGES:  Yes, Your Honor.

13          MS. LYBRAND:  Yes, Your Honor.

14          THE COURT:  Officer Haley, you are free to remain in

15  the courtroom.  Just don't discuss with anyone who is still

16  sequestered what's going on in here, and you are also free to

17  go if you like.

18     Next witness.

19          MR. BRIDGES:  Call Officer Jeffrey Elenbaas.

20          **JEFFREY ELENBAAS, GOVERNMENT'S WITNESS, DULY SWORN**

21                   DIRECT EXAMINATION

22  BY MR. BRIDGES:

23  Q    Will you please state your name and spell it for the

24  record.

25  A    Officer Jeffrey Elenbaas.  Last name E-L-E-N-B-A-A-S.

1   Q    I got it right.  And are you an officer with North

2   Little Rock Police Department?

3   A    I am.

4   Q    And how long have you been an officer?

5   A    About six and a half years.

6   Q    And what is your position there?

7   A    I am a patrol officer.

8   Q    And have you been a patrol officer all six and a half

9   years?

10  A    Yes, I have.

11  Q    And was that your position back in March of 2016?

12  A    It was.

13  Q    Do you recall back in 2016 assisting with a traffic stop

14  around 3:45 in the afternoon?

15  A    I do.

16  Q    How did that come to your attention?

17  A    I was a backing officer on a stop Sergeant Haley had made.

18  Q    And how were you notified about that stop?

19  A    He called out the traffic stop over our radio and, from

20  there, I was in the area and assisted him.

21  Q    Dispatch didn't notify you?  He notified you directly?

22  A    Correct.

23  Q    And was that a stop of a tan Buick Regal?

24  A    It was.

25  Q    Can you describe the scene at the time that you arrived?

1  A    Yeah.  As I arrived, Sergeant Haley had already made

2  contact with the individuals and the passenger door was open.

3  And from that, I made contact with the passenger.

4  Q    To clarify, was Sergeant Haley's vehicle behind the tan

5  Buick?

6  A    Yes.  And mine was positioned directly behind that.

7  Q    Did you activate your blue lights or your sirens?

8  A    No.

9  Q    Where was Officer Haley located when you arrived?

10  A    He was -- I believe he was speaking with the driver at the

11  time.

12  Q    And was that at the driver's side of the Buick?

13  A    Yes, it was.  Yes.

14  Q    And how did you react?

15  A    From there, there were two occupants of the vehicle.  I

16  went to the passenger side to make contact with the passenger

17  since he was already speaking with the driver.

18  Q    What happened?

19  A    The passenger was Mr. Boles, and from there I asked for

20  identification to ID himself and just the general nature of the

21  stop to proceed from there.

22  Q    Anything else about the stop that caught your attention?

23  A    Sergeant Haley notified me of the cracked windshield,

24  which that drew my attention to that, but beyond that there was

25  nothing that stuck out to me immediately, no.

Elenbaas - Direct

1   Q    Did you detect any controlled substances in the vehicle?

2   A    No.  I did not at the time.

3   Q    Did you conduct a pat-down search of Mr. Boles?

4   A    Yes, I did.

5   Q    And did you find anything on his person?

6   A    No.

7   Q    And was your car equipped with a video recorder?

8   A    Yes, it is.

9   Q    Did you capture any video that day?

10  A    No.

11  Q    Why not?

12  A    Because I did not turn my video on.

13  Q    Did you take any pictures of the crime scene?

14  A    No.

15  Q    Why not?

16  A    It's not customary to do so based on what was completed.

17  Q    Are you given a camera with which to take pictures of

18  crime scenes?

19  A    No.  I do not have a department-issued camera.

20  Q    So once you arrive and you speak with Mr. Boles, you ask

21  him to exit the vehicle?

22  A    Correct.

23  Q    And you conduct a pat-down search?

24  A    Correct.

25  Q    And you find nothing on this person?

1   A     Correct.

2   Q     What happens next?

3   A     Just speaking with him, asking general questions, where

4   was he coming from, what was he planning to do.  Just kind of

5   small talk.

6   Q     Did you place him under arrest?

7   A     Yes.

8   Q     Why?

9   A     Sergeant Haley notified me there was a pistol beneath the

10  passenger seat.  From there, I placed him in custody.

11  Q     Was Mr. Haley conducting a search of the vehicle while you

12  were speaking with Mr. Boles?

13  A     That's correct.

14  Q     Where was Mr. Boles at the time that that search was

15  taking place?

16  A     He was seated on the back bumper of the vehicle.

17  Q     And the driver as well?

18  A     Correct.

19  Q     Have you ever pulled anyone over or issued a ticket for a

20  vehicle that has a broken windshield?

21  A     Yes.

22  Q     Or a crack in the windshield?

23  A     Yes.

24  Q     And why would you pull someone over in that situation?

25        MS. LYBRAND:  I am going to object to relevance.  He

1   is not the one who made the stop.  The other officer has

2   already testified to it.

3        THE COURT:  Well, the test -- of course, we will argue

4   the law, but objectively, I think this is relevant.  In other

5   words, you may object, but I am going to allow the question

6   because of the legal test I have to apply.  So your objection

7   is preserved.

8        Go ahead.

9        THE WITNESS:  Could you repeat the question?

10  BY MR. BRIDGES:

11  Q    Sure.  Have you ever pulled a vehicle over because of a

12  cracked windshield?

13  A    Yes, I have.

14  Q    Why would you pull that vehicle over?

15  A    Generally would be an obstruction of the driver's view of

16  the traffic lanes and other vehicles in the roadway.

17  Q    And do you recall with specificity looking at the

18  windshield of the tan Buick?

19  A    I glanced at it, but that was about the extent of it.

20  Q    Do you remember the extent of the cracks in the

21  windshield?

22  A    It was enough to be beyond visible, but anything beyond

23  that, I don't know.

24        MR. BRIDGES:  Pass the witness, Your Honor.

25                    CROSS-EXAMINATION

1   BY MS. LYBRAND:

2   Q    Officer Elenbaas, is there traditionally a few officers

3   who you work with on patrol?  Officer Perez and a couple of the

4   others that you traditionally find yourself working with?

5   A    Correct.

6   Q    And Officer Haley is not one of those officers, correct?

7   A    It depends on how much paperwork he has to take care of as

8   a sergeant, but a lot of times when he is able, he does work

9   with us quite frequently.

10  Q    Okay.  Is it an official gang reduction workforce or

11  generally the work you find yourselves doing?

12  A    Generally the work we find ourselves doing.  We are

13  assigned to a specialized unit, but it's not specifically gang.

14  Q    What's the unit called?

15  A    At the time it was called SET, but it's generally

16  projects, the project unit.  And SET which stands for

17  specialized enforcement team.

18  Q    All right.  So you responded -- you were the second

19  officer on scene for this interaction, correct?

20  A    I was.

21  Q    Okay.  How soon after Haley made contact with Mr. Boles

22  and the driver did you arrive?

23  A    I would say roughly 20 or 30 seconds.

24  Q    20 to 30 seconds, okay.  And did he notify you via radio?

25  A    He did.

1    Q    What did he say?

2    A    He advised he was going to make a traffic stop and the

3    location where it was going to occur.

4    Q    And after Mr. Boles was arrested, did you speak with

5    another woman who arrived on scene, Aleshia Brooks or Banks?

6    A    I did.

7    Q    Did she identify herself as Mr. Boles's girlfriend?

8    A    Correct.

9    Q    You advised her what he was being charged with, correct?

10   A    I did.

11   Q    And that was the gun?

12   A    Yes.

13   Q    Did she tell you there was no way he could have possession

14   of a firearm?

15   A    She did.

16   Q    And that was because he had been with her until he hopped

17   in this vehicle?

18   A    Correct.

19   Q    And they had gone to a funeral that day?

20   A    Correct.

21   Q    And he didn't have a gun on him at that point?

22   A    Right.

23   Q    And then she saw him shirtless, and he didn't have a gun

24   on him at that point?

25   A    Right.

1   Q     Did that information affect your investigation in any way?

2   A     I don't believe so because their stories didn't correlate

3   with one another as far as --

4          MR. BRIDGES:  Your Honor, I object.  I am not sure

5   this is relevant to admissibility of the evidence.

6          THE COURT:  Well, it's not.  This is just a motion to

7   suppress, and all this other might be whether he was really in

8   actual possession of the gun or just a passenger in the car

9   where a gun happened to be.

10          MS. LYBRAND:  I will move on, Your Honor.  May I

11   confer with my client briefly?

12          THE COURT:  You may.

13          MS. LYBRAND:  Your Honor, I will pass the witness.

14          MR. BRIDGES:  Nothing further.

15          THE COURT:  May Officer Elenbaas be excused?

16          MR. BRIDGES:  Yes, Your Honor.

17          MS. LYBRAND:  Yes, Your Honor.

18          THE COURT:  You're excused.  Thank you.  You are free

19   to go and free to stay in the courtroom.

20          THE WITNESS:  Thank you, Judge.

21          THE COURT:  You won't be testifying anymore.

22      I guess no one else is sequestered, correct?

23          MR. BRIDGES:  Yes, Your Honor.

24          THE COURT:  Do you have any more witnesses?

25          MR. BRIDGES:  No further witnesses.

1    THE COURT:  Would you like to present any evidence?

2    MS. LYBRAND:  No, Your Honor.

3    THE COURT:  All right.  I will permit you-all to

4    argue, and I will recognize the United States first.

5    MR. BRIDGES:  Your Honor, the two cases that I

6    submitted in the brief, the Davis case and the Villanueva case,

7    made clear the law in this circuit, and that was the basis for

8    the stop.  A cracked windshield can be sufficient basis for

9    reasonable suspicion, and it's simply a matter of degree.  How

10   cracked is the windshield?  Is it cracked in a way that makes

11   the car unsafe to operate?  Is it a safety defect pursuant to

12   Arkansas law?  And the testimony is that, yes, the windshield

13   was cracked, had large vertical cracks across the driver's side

14   and, in their subjective view, it was cracked in a way that

15   made the car unsafe.  And my understanding of the issue is, if

16   there is reasonable suspicion, the rest of the dominoes fall.

17       Once they approach the car subsequent to that stop, they

18   noticed the odor of marijuana, the presence of marijuana.  A

19   search of that vehicle subsequent to those orders to detect the

20   gun.  The stop was reasonable.

21   THE COURT:  Tell us about the -- distinguish for me

22   the case that came out of Nebraska that the defendant is citing

23   in his brief.

24   MR. BRIDGES:  The Nebraska case, in my opinion, is an

25   opposite because it doesn't deal with a local and state law the

1   way that the Eighth Circuit cases do.  How our officers should

2   have applied Nebraska law, I can't say, but it complied with

3   Arkansas law in a proper way in this case.  Nothing further.

4           THE COURT:  All right.  All right.  Thank you.

5       Ms. Lybrand?

6           MS. LYBRAND:  Your Honor, the cases cited by the

7   government in their brief rely on a safe mechanical condition

8   statute.  Most important to the testimony today is that both of

9   these officers testified the stop was made pursuant to a

10  windshield obstruction statute and that they made the stop

11  based on obstructed view statute.  So their testimony as to the

12  probable cause for the stop does not meet the cases or does not

13  rely on the same statute that's addressed in the cases that the

14  government sites.  So that's a major issue.

15      Additionally, there have been cases in this jurisdiction

16  and others finding there is not probable cause to stop based on

17  cracked windshield obstruction, and I can brief those at a

18  later point.  I know there was a civil case, and I did have a

19  case dismissed before based on a stop for windshield

20  obstruction.  So I can re-brief the Court on that, if

21  necessary, after this hearing.  I apologize I didn't have those

22  with me today.  That would be the most important basis for our

23  suppression argument, and I would ask the Court to suppress the

24  evidence on that basis.

25      If the Court does find that there was probable cause to

1   stop the vehicle, I would ask the Court to consider that there

2   is some conflicting statements between the police report and

3   the testimony.  It is clear that the vehicle was stopped.  The

4   drivers were getting out of the car.  It was already stopped by

5   the time the officer made contact with them.  I would ask the

6   Court to look to the Supreme Court of the United States case,

7   *Utah v Strieff*, S-T-R-I-E-F-F, Citation 136 S. Court 2056,

8   where the Supreme Court held that an investigatory stop and

9   search of a person leaving an alleged narcotics house wasn't

10  legal because there wasn't enough suspicion to make the

11  contact, which I believe would be akin to this circumstance and

12  I would submit as much to the Court.

13        The only reason in that case that they found that the

14  evidence should continue to come in is because that defendant

15  had an active warrant.  In this case, Mr. Boles did not have an

16  active warrant.  So on those two bases, we request that the

17  evidence be suppressed.

18              THE COURT:  Of course, a house is different than a

19  car.

20              MS. LYBRAND:  Your Honor, he was not in the house.

21  The defendant in that case had left the house.  The officers

22  were observing a house, believed it was a narcotics house, and

23  made contact with him in a parking lot.  But based on those two

24  arguments, we would ask the Court to suppress the evidence

25  here.

1      THE COURT:  Any response?

2      MR. BRIDGES:  Sure.  Two quick points, Your Honor.

3  The standard is having the officers identify the statute by

4  name.  I think it's clear from their testimony that the basis

5  of the stop was they believed the car to be in an unsafe

6  condition because the windshield was cracked.  It's not called

7  the cracked windshield statute, I understand that, but there is

8  a legal basis for the stop and that should be sufficient.

9      As to the Supreme Court case, I haven't read it.  I am not

10  familiar with it, but I believe that the driver of the vehicle

11  was still in the vehicle when he was approached.  I think this

12  is significantly different than the occupants in the house.

13      THE COURT:  I am going to take this under advisement

14  and give Ms. Lybrand an opportunity to show me the other cases

15  that she said -- we found one other that is not in her favor,

16  so I will just let you submit it.  Why don't we do it that way?

17  And I will make some findings of fact, and findings of fact are

18  really quite simple because I don't believe there is much

19  dispute in terms of the facts, and I do find that Officer Haley

20  saw the tan Buick Regal make a left-hand turn in front of him

21  on 19th Street.  He followed that vehicle because he saw that

22  it had a cracked windshield.  He stopped behind the vehicle, at

23  which time he exited his vehicle, and he believed -- he

24  testifies to this -- he believed that no one, no occupant of

25  the Buick saw him initially even though his blue lights were

1    on.

2          The passenger, who is the defendant before the Court,

3    Mr. Boles, exited the vehicle, and the officer directed him to

4    go back into the vehicle, and he finally complied.  At some

5    point the officer did see Mr. Boles bend over and perhaps put

6    something under the seat.  That's what he thought he saw.  And

7    about 30 seconds after both the defendant's car and the

8    officer's car had stopped, Officer Elenbaas came on the scene

9    and started talking to the passenger, Mr. Perry, and saw what

10   he believed to be marijuana or marijuana shake.  He also

11   detected -- excuse me -- Officer Haley had detected the odor of

12   marijuana as well.  I am sorry.  Elenbaas did not go to the

13   driver's side.  Elenbaas went to the passenger side and Haley

14   went to the driver's side and detected the odor of the

15   marijuana and the shake.

16         Haley found the gun and the two individuals who were

17   occupants of the car, one being the defendant before the Court,

18   were arrested.  And Mr. Perry's mother took the car away.  The

19   car had a cracked windshield.  We don't know exactly how

20   cracked it was except we do know Officer Haley said that there

21   was a crack about a foot long and then two other cracks coming

22   from that and that these were in the driver's field of vision.

23         Those are my findings.  Does anyone object to that much?

24              MS. LYBRAND:  No, Your Honor.

25              MR. BRIDGES:  No, Your Honor.

1   THE COURT:  All right.  And so really, the sole

2   remaining issue is really a legal one, and that is whether it

3   is objectively reasonable for Officer Haley to make the stop.

4   And even if he didn't make the stop -- that is, if they were

5   stopping anyway -- to appropriate them and search the car.  And

6   I believe the standard -- I don't think it matters if they saw

7   him or not.  He searched the car, found the gun, found the

8   drugs.

9       All right.  I will take that under advisement.  How much

10  time do you need to get this to the Court?

11          MS. LYBRAND:  Would ten days be acceptable?

12          THE COURT:  That's fine.  Ten days, and you will have

13  five to respond.

14          MR. BRIDGES:  Sure.

15          THE COURT:  And we will do an order to that effect, a

16  written order to that effect so it will be in the record for

17  anyone who wants to see it.  You know, I have never had a case

18  quite like this.  So I have often wondered about cracked

19  windshields when I have had them.

20          MR. BRIDGES:  Ms. Lybrand and I are pioneers.

21          THE COURT:  All right.  Thank you very much.  You're

22  excused.

23      (Proceedings adjourned at 10:41 a.m.)

24

25

1              C E R T I F I C A T E

2        I, Cheryl Nelson Kellar, Official Court Reporter, do

3    hereby certify that the foregoing is a true and correct

4    transcript of proceedings in the above-entitled case.

5

6    /s/ Cheryl N. Kellar, RPR, CRR, CCR   Date:  March 1, 2017
          United States Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25